Matthew D. Lamb
Nevada Bar No. 12991
BALLARD SPAHR LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106
Telephone: (702) 471-7000
Facsimile: (702) 471-7070
LambM@ballardspahr.com

John G. Kerkorian*
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004-2555
Telephone: (602) 798-5400
Facsimile: (602) 798-5595
KerkorianJ@ballardspahr.com

* Admitted Pro hac vice

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| IPFS CORPORATION, a Missouri Corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>LORRAINE CARRILLO, an individual,<br><br>    Defendant. | Case No.  2:14-cv-00509-GMN-NJK<br><br>**DEFENDANT'S CLOSING ARGUMENT** |

## I. INTRODUCTION

  IPFS' damages case is premised on a litany of factual, evidentiary, and mathematical errors.  The evidence which IPFS proffered at trial does not support an award of any damages—much less an award that makes IPFS better off than it would have been if the parties had fully performed the Agreement.  Judgment should be entered in favor of Carrillo.

  First, IPFS presented no evidence on the central question at trial – whether Carrillo caused IFPS damages.  Instead, IPFS simply proved that Carrillo's current employer, PAC, received business from seventeen insurance agencies after Carrillo

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

left IPFS. The question, however, is whether IPFS would have retained the business they claim they lost had Carrillo not communicated with those agencies. IPFS presented no evidence on this issue, and therefore, failed to meet its burden of proof.

Instead, IPFS relied on speculation for its claim that Carrillo's actions caused it damage. The evidence showed that the premium finance industry is highly competitive and volatile. As soon as Carrillo left IPFS, its relationships with the seventeen relevant agencies were vulnerable. Therefore, IPFS likely would have lost business from these agencies even if Carrillo had never contacted them after she left the company. Nevertheless, IPFS improperly assumed that every dollar of business which these agencies placed with Carrillo's new employer, PAC, would have been placed with IPFS but for Carrillo's alleged breach of the Agreement. This gap in logic undermines IPFS' entire damages case.

IPFS' case is even more speculative with regard to future lost profits. IPFS calculated its future lost profits using discount rates and growth rates that it obtained from industry publications. These publications—which are the only source that IPFS has for the relevant figures—obviously constitute hearsay. The Court recognized as much when it ruled that IPFS cannot use the publications to prove the truth of the matter asserted—i.e., the correctness of the relevant discount rates and growth rates. But that is exactly what IPFS has done. IPFS literally copied and pasted these rates from the industry materials into its damage calculation. Without the industry publications, IPFS' future damage computation is unsupported by admissible evidence and constitutes sheer guesswork. Further, as a purely factual matter, none of the relevant agencies were contractually or otherwise obligated to continue doing business with IPFS after Carrillo left. IPFS assumes, with no factual support, that all seventeen agencies would have continued placing a similar level of business with IPFS for the next eight years—long after the expiration of the restrictive covenant in the Agreement.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

2

IPFS also exaggerated the amount of its damages by failing to fully account for costs it avoided when Carrillo left the company.  Because IPFS no longer employs Carrillo, and because IPFS did not hire another salesperson to replace her, IPFS saved the full amount of her compensation.  Yet IPFS only subtracted a fraction of Carrillo's compensation when calculating its lost profits.  IPFS also failed to subtract the full "cost of funds" and "administrative costs" it would have incurred to service the relevant business.  When these amounts are properly deducted, IPFS' claimed lost profits are a tiny fraction of the amount it claims.

Finally, it was not until July 8, 2015 that the Court modified the Agreement in this case to render it enforceable.  Prior to that date, the Court had ruled that the Agreement unenforceable as written. Doc. 37.  Indeed, IPFS never tried to enforce the Agreement as written at any point in this case.  Until July 8, Carrillo did not know whether the Court would modify the Agreement to make it enforceable, and did not know which particular modifications the Court might make.  She could not conform her conduct to a modified version of the Agreement that did not yet exist.  Therefore, it is fundamentally unfair to award damages against Carrillo which accrued before July 8.  There was no enforceable contract between the parties until that date.  IPFS therefore should be estopped from recovering damages based on pre-modification conduct.

At bottom, IPFS' damage calculation places it in a better position than it would have enjoyed had the parties performed under the contract, and punishes Carrillo for disobeying a contractual obligation that had yet to exist.  The law and the facts do not support such a result.

## II.   SUMMARY OF IPFS' DAMAGES CASE

Before discussing the multiple problems with IPFS' damages case, it is helpful to explain how IPFS calculated its damages.  Instead of simply producing sales records for the 17 agencies in the years following Carrillo's departure (which IPFS admitted were readily available to it), IPFS hired a certified public accountant

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

DMWEST #13987282 v8

named Stephen W. Browne to estimate its damages, including certain future damages allegedly accruing after the Agreement expired.   IPFS began by calculating its profit margin for the 17 relevant agencies in 2013—the last full year when Carrillo worked for the company.  Tr. Ex. 9A at 1-2.[1]  IPFS stated that its total 2013 income from these agencies was $321,522, which consisted of $253,766 in interest income and $67,756 in late charges.  <u>Id.</u> at 1.  IPFS then subtracted the costs it incurred in 2013 to service the 17 agencies.  <u>Id.</u>  The largest of these costs was Carrillo's compensation.  However, IPFS did not subtract the full $133,144 amount that it paid for Carrillo's salary, benefits, expenses, and payroll taxes.  <u>Id.</u> at 6.  Instead, it only subtracted $37,347.  <u>Id.</u> at 1.  In addition, IPFS did not subtract the full $140 per-account administrative expenses which it incurred for the 17 agencies.  <u>Id.</u> at 4.  In 2013, there were a total of 900 accounts associated with these agencies, meaning the total administrative fees attributable to the agencies were $126,000.  <u>Id.</u>  Nevertheless, IPFS utilized a $27 "incremental" per-account fee, resulting in administrative fees of only $24,300.  <u>Id.</u> at 1 & 4.  IPFS also failed to subtract the full cost of funds it incurred for the 17 agencies.  It used an "incremental" 0.559% cost-of-funds figure instead of its actual 1.450% cost-of-funds figure.  <u>Id.</u> at 1 & 10.  IPFS' calculations ultimately yielded a profit margin of 7.339% for the 17 agencies.

IPFS then used this 7.339% profit margin to calculate the amount of its lost profits during the term of the Agreement, from January 2014 through July 2015. As part of this analysis, IPFS assumed that every dollar of business which the 17 agencies placed with PAC during the term of the Agreement would have been placed with IPFS but for Carrillo's alleged solicitation of the 17 agencies.  IPFS then

---

[1] The original version of IPFS' computation, which included 19 agencies, is on file with the Court as Document 102-7.  Several days before trial, IPFS served Carrillo with an "updated" computation that removed two insurance agencies, resulting in the 17 total agencies that are currently in issue.  The updated computation is Trial Exhibit 9A.

4

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

multiplied the receivables that PAC obtained from the 17 agencies during this period by the 7.339% profit margin, yielding lost profits of $202,716. Id. at 1.

Finally, IPFS attempted to calculate the future damages it would allegedly incur between 2015 and 2023. It began by annualizing the receivables which PAC had received from the 17 agencies during the 9-month period ending July 23, 2015. Id. at 8. It then increased this annualized figure in each year from 2015 through 2023. Id. at 1-2. The percentage increases for each year are based on growth rates which IPFS copied and pasted from an *Industry Growth Outlook Report* prepared by the company MicroBilt. Tr. Ex. 11. The MicroBilt report includes predicted growth rates for various sectors of the economy. To predict the future growth of the premium finance industry, IPFS averaged growth rates for the industries "All Other Nondepository Credit Intermediation" and "Insurance Agencies and Brokerages." Tr. Ex. 9A at 1-2.

After IPFS estimated the amount of receivables which PAC would earn from the agencies in each future year, IPFS applied its 7.339% profit margin from 2013, yielding IPFS' lost profits for each year. Id. It then calculated the present value of these future lost profits using a specially created discount rate. Id. The discount rate includes five separate components. Id. at 9. IPFS copied and pasted three of these five components from a *2015 Valuation Handbook* by the company Duff & Phelps. Tr. Ex. 13. The three components which IPFS copied from the Duff & Phelps handbook were an "equity risk premium" of 6.21%, a "size premium" of 3.74%, and an "industry risk premium" of 1.06%. Tr. Ex. 9A at 9. After IPFS discounted its future damages to present value, they totaled $775,015. Of course, IPFS' future damage calculation assumes that all of the business the 17 agencies have placed with PAC has been irreversibly lost. IPFS does not account for the possibility that it might win back a portion of this business during the 8-year future damage period.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

5

IPFS did not call Browne as a trial witness to testify about the damage computation he prepared.  Nor did IPFS call any of the individuals who prepared the industry materials which Browne and IPFS relied upon.  Instead, IPFS called its president, Michael Gallagher, as a lay witness.  Gallagher parroted Browne's analysis from the witness stand, all the while admitting that Browne actually prepared the damage computation.  Tr. at 175:16-178:1.

## III.   ARGUMENT

### A.   IPFS failed to prove that a breach of the Agreement directly caused its alleged damages.

As the plaintiff in this case, IPFS must demonstrate by a preponderance of the evidence that Carrillo's breach of the Agreement caused damages to IPFS.  See Rodriguez v. Suzuki Motor Corp., 936 S.W.2d 104, 110 (Mo. 1996) ("Preponderance is the minimum standard in civil disputes.") (citation omitted); see also Mayer v. Gary Partners & Co., 29 F.3d 330, 333 (7th Cir. 1994) (in diversity actions, "state law determines whether the plaintiff must prove the case by a preponderance, by clear and convincing evidence, or by some other standard.").  Under Missouri law, a plaintiff may only recover lost profits "which are incidental to, and directly caused by, the breach, and may reasonably be supposed to have entered into the contemplation of the parties, and not speculative profits or accidental or consequential losses, or the loss of a fancied good bargain."  Guidry v. Charter Communs., Inc., 269 S.W.3d 520, 533 (Mo. Ct. App. 2008) (quoting Weber Implement Co. v. Acme Harvesting Mach. Co., 268 Mo. 363, 371, 187 S.W. 874 (Mo. 1916) (emphasis added)).  The amount of lost profits "should, in the event of uncertainty, at least be supported by the best evidence available."  Coach House of Ward Parkway, Inc. v. Ward Parkway Shops, Inc., 471 S.W.2d 464, 473 (Mo. 1971).

IPFS did not establish by a preponderance of the evidence that its alleged damages were caused by Carrillo's breach of the Agreement.  IPFS simply assumed that, but for Carrillo's solicitation of the 17 agencies, every dollar of business which

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

6

the 17 agencies placed with PAC during the term of the Agreement would have been placed with IPFS instead. The evidence introduced at trial disproves IPFS' assumption.

Carrillo testified she had no exclusive agreements with any insurance agencies. Tr. at 91-92:22-1. In fact, the agents with whom Carrillo worked typically utilized the services of 2-4 premium finance companies simultaneously. Tr. at 92:2-10 & 349:15-17. While at IPFS, Carrillo frequently quoted business for agencies that ultimately decided to place business with another premium finance company. Tr. at 92:11-25. In those circumstances, Carrillo still maintained an ongoing relationship the agent. Tr. at 93:1-6. Carrillo testified that every loan a premium finance company makes is different. Tr. at 91:19-21. Accordingly, the amount of business Carrillo did with a particular agency varied from year to year. Tr. at 93:8-18. There are multiple factors that influence IPFS' volume with a given agency from year to year, including: (1) whether the customers of the insurance agency choose to pay their premiums in cash or finance the premiums; (2) whether the agency preserves (or loses) its customer relationships in a given year; (3) whether the customers of the agency go out of business or scale back their insurance purchases in a given year; (4) the pricing and down-payment terms offered by IPFS; and (5) other preferences of the agency's customers. Tr. at 90:2-93:18.

During questioning by IPFS, Carrillo testified that she was "successful" in selling business to the 17 agencies. However, she went on to explain that her job is not to "sell" but to provide a choice to the independent insurance agents. Tr. at 86:10-87:4. The agent or the insured chooses the finance company that best fits the particular situation. Tr. at 88:10-89:4. Thus, while it is clear that PAC received loans from the 17 agencies, IPFS offered no evidence as to the reason(s) a particular agent chose PAC instead of IPFS or some other premium finance company for any particular loan.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

DMWEST #13987282 v8

Further, IPFS President Michael Gallagher and PAC President Peter Kugelmann both testified there are a number of factors which influence an insurance agency's choice of premium finance company other than the agency's relationship with a particular salesperson.  Tr. at 192:6-15 & 312:3-13.  Gallagher admitted that IPFS' level of business with the 17 agencies has fluctuated from year to year for a variety of reasons having nothing to do with Carrillo.  Tr. at 187:14-20 & 192:6-15.[2]  Similarly, Rachel Yunk admitted the premium finance industry is highly competitive and that business frequently moves between competitors.  Tr. at 349:10-14.   Both Gallagher and Kugelmann testified that they cannot readily determine why an agency chooses one premium finance company over another in a given case.  Tr. at 255:17-256:1 & 312:14-19.

Perhaps most significantly, the Court prevented Yunk from speculating about whether the 17 agencies would have placed the relevant business with IPFS instead of PAC but for Carrillo's solicitation.

> MS GASPER:   In your opinion, if she hadn't been contacting and communicating with these folks, would IPFS have been able to transition these relationships?
>
> MR. KERKORIAN:  Objection, calls for speculation.
>
> THE COURT:  Sustained.

Tr. at 339:23-340:3.

This captures the fatal flaw in IPFS' damages case.  There must be evidence – not mere speculation – to establish that IPFS would have retained all the business PAC did with the 17 agencies but for Carrillo's actions.  There is none.

---

[2] The tables attached hereto as Exhibit A and B are derived from Trial Exhibits 2 and 515, as well as Gallagher's testimony. They establish the unpredictability of the revenue from year to year, even while Carrillo was employed by IPFS.  It is reasonable to infer from this evidence that IPFS' revenue for these 17 agencies would be even more unpredictable after Carrillo left IPFS and joined PAC.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

8

Without evidence, an award of damages is speculative and improper.  The Court's ruling on Carrillo's objection acknowledges as much.[3]

IPFS' assertion that the 17 agencies are "longtime clients" must be viewed with a healthy degree of skepticism.  None of the 17 agencies were contractually or otherwise obligated to continue doing business with IPFS after Carrillo left. Tr. at 91:22-92:1  To the extent the 17 agencies had a "longtime" relationship with anyone, it was with Carrillo, not IPFS.  Carrillo had done business with 9 of the 17 agencies before she even joined IPFS' predecessor in 1993. Tr. at 84:1-18.  The agencies were connected to Carrillo as an individual, not to IPFS as a company.  Therefore, any business which IPFS had with the 17 agencies became vulnerable as soon as Carrillo left the company, and IPFS had no reasonable expectancy of continued revenue from the agencies.  Regardless of whether Carrillo had later solicited the agencies, it is reasonable to expect the agencies would have begun placing business with other premium financing companies, including PAC, during the 18-month term of the Agreement.  Tr. at 97:19-98:3 (Carrillo's testimony that departure of salesperson often causes insurance agencies who had worked with salesperson to explore other companies); 314:10-13 (Kugelmann's testimony that 17 agencies would have followed Carrillo regardless of whether she solicited them).  Again, the evidence does not support IPFS' assumption that every dollar of revenue which PAC earned from the 17 agencies during the term of the Agreement would have gone to IPFS but for Carrillo's breach of the Agreement.

Finally, 2 of the 17 agencies at issue had preexisting relationships with PAC before Carrillo left IPFS.  Both Carrillo and Kugelmann testified that Karen Yu,

---

[3] IPFS' burden here is not unreasonably high.  The proof problems IPFS encountered might have been easy to overcome had IPFS presented the testimony of any customers.  Counsel for IPFS remarked in his opening statement that it did not subpoena any customers to testify about the reasons business was moved to PAC because PAC "conceded that PAC earned business from IPFS customers as a result of Ms. Carrillo's efforts." Tr. at 7:11-19.  However, as the above reflects, PAC made no such concession.  The testimony of all the witnesses was in agreement that no one knows why business left IPFS and went to PAC.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

DMWEST #13987282 v8

another PAC salesperson, solicited L/P Insurance and George Brown Insurance for business before Carrillo arrived.  Tr. at 100:24-101:22 & 269:16-270:7.  Both agencies had been entered in PAC's computer system, and L/P Insurance had already placed loans with PAC beginning in 2010.  Tr. at 270:3-4.  IPFS failed to establish that these two agencies placed business with PAC because of solicitation by Carrillo, and not because of their established relationship with PAC.

### B.    IPFS failed to prove future damages by admissible evidence.

Even if IPFS could prove that it sustained damages from Carrillo's breach of the Agreement, it would still not be entitled to recover future damages for the years 2015 through 2023.  First, IPFS did not offer any evidence of its actual 2014 or 2015 sales for the 17 agencies at issue, even though this information is readily available to it.  If IPFS actually lost any business from the 17 agencies, we would be able to see it in their sales figures for the years following Carrillo's departure.  IPFS' failure to provide that information indicates that nothing was actually "lost."  The failure to offer its 2014 and 2015 sales data also demonstrates IPFS did not use the "best evidence available."  <u>Coach House</u>, 471 S.W.2d at 473.  Instead, IPFS presented a convoluted damages computation that relies on PAC's sales, as well as hypotheticals, assumptions and expert analysis.  Moreover, as explained below, IPFS impermissibly used hearsay materials to calculate its future damages.  IPFS' future damages claim, which depends on these hearsay materials, necessarily fails.  And from a purely factual standpoint, IPFS' claim for future damages is even more speculative than its claim for present damages.  Therefore, the Court should not award IPFS any such damages.

### 1.    IPFS' damages were calculated using copied-and-pasted figures from industry publications, which constitute hearsay.

When the Court denied Carrillo's motion in limine [Dkt. No. 110], it held that Michael Gallagher—IPFS' primary witness—could offer lay opinion testimony on IPFS' future damages.  Therefore, under the Court's ruling, Mr. Gallagher was

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

required to base his damages testimony on his own personal knowledge and his own personal opinion.  See Fed. R. Evid. 701(a) (lay witness' opinion must be "rationally based on the witness's perception").  He was not allowed to rely on inadmissible materials—such as hearsay—to form his lay opinion on IPFS' damages.  Cf. Fed. R. Evid. 703 (expert witnesses, but not lay witnesses, may rely on inadmissible facts or data when forming an opinion).

The Rules of Evidence define hearsay as a statement that "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c)(1)-(2).  As noted above, IPFS' future damage calculation incorporates various data from industry publications.  The future growth rates which IPFS used in its calculation are copied from the MicroBilt *Industry Growth Outlook Report*.  Tr. Ex. 11.  Relatedly, the discount rate IPFS used in its calculation was specially created for this case using five interest rate components.  Three of the five interest rates were copied from the Duff & Phelps *2015 Valuation Handbook*.  Tr. Ex. 13.

Both of these publications constitute hearsay.  They are out-of-court statements, made by their respective authors, which IPFS used to prove the truth of the matters asserted.  The *Industry Growth Outlook Report* predicts future growth rates in various industries.  IPFS copied and pasted these rates into its damage computation to calculate its future damages.  In other words, IPFS necessarily relied on the data from the *Industry Growth Outlook Report* as being truthful and accurate.  Similarly, the *2015 Valuation Handbook* provides discount rates for certain types of corporate revenue.  IPFS copied and pasted these rates into its damage computation to calculate the present value of its future damages.  Thus, IPFS also relied on the *2015 Valuation Handbook* as being truthful and accurate.

At trial, IPFS sought to introduce both of these documents as exhibits.  See Tr. Ex. 11 & 13.  Carrillo objected to the *Industry Growth Outlook Report* on foundation and hearsay grounds.  Tr. at 151:18-152:5. The Court responded:

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

11

Inasmuch as he's offering it or it's being offered just to inform me, the reader of Plaintiff's Trial Exhibit 9A, where these numbers are coming from, I'll accept it just for that purpose, but certainly not for the truth of the information that's in Exhibit 11 and whether or not those forecasts are accurate or not or based on credible information and so forth, but just to inform me of where he's coming up with this projected growth.

But I'm only going to accept it for that purpose. Just for -- admitted for a limited purpose.

So I suppose your objection is granted in part.

Tr. at 152:6-16.

Carrillo also objected to the *2015 Valuation Handbook* on foundation and hearsay grounds. Tr. at 375:25-376:1. The Court responded:

Well, I understand the objection. And clearly I'm not going to accept these numbers without any further information about this particular publishing group or the -- you know, I don't know the -- don't really know enough about whether this is a periodical type that I could admit on that basis. He wasn't really testifying as an expert, so I'm not sure it applies in that way either.

But as -- inasmuch as it informs me as to what it is that he is referring to, where he got his numbers from, what it -- what it is that he says he looks at on a regular basis to come up with those values that he used for that limited purpose, I'll refer to these two pages and admit them on that basis.
(Exhibit 13 received into evidence.)

MR. KERKORIAN: But, Your Honor, to be clear, not for the truth of the matter asserted?

THE COURT: Right. Not for the truth of the matter asserted.

Tr. at 376:24-377:17.

Because the Court specifically ruled that IPFS' industry publications were not admissible to prove the truth of the matters asserted, IPFS cannot use these publications to prove the correctness of the future growth rates or the correctness of the discount rates. In reality, however, that is the sole purpose for which IPFS used the documents. These documents are the sole authority for the future growth rates and three components of the discount rate in IPFS' damage computation. These

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

DMWEST #13987282 v8

rates are not based on any independent analysis by Michael Gallagher—or, for that matter, any independent analysis by Stephen Browne.   Neither Gallagher nor Browne used any other information to derive the growth rates and the three components of the discount rate.   Instead, IPFS simply copied and pasted the rates from the industry materials into its damage computation.   Under hornbook evidence principles, copying and pasting information from an out-of-court statement and relying on the information as correct is an impermissible hearsay use.

IPFS may argue that Gallagher can rely on the hearsay publications because Gallagher and other individuals in the premium finance industry typically rely on such information when calculating future profits.   But that is not the governing standard for lay opinion testimony.   If Gallagher were testifying as an <u>expert</u> witness, he would arguably be allowed to base his opinion on inadmissible hearsay, including the publications.   <u>See</u> Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.   If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").   However, the Court has specifically held that Gallagher is testifying as a <u>lay</u> witness.   Unlike experts, lay witnesses like Gallagher cannot adopt the opinions of third parties as their own.   Gallagher was only allowed to offer opinions which he himself developed—not opinions which the authors of the industry publications developed.   <u>See</u> Fed. R. Evid. 701(a).

IPFS also may argue that there is no hearsay issue because the subject of Gallagher's testimony is lost profits.   The Court previously ruled that Gallagher may offer lay testimony about IPFS' lost profits based on his knowledge of IPFS and his experience with the company.   But this merely begs the question of whether Gallagher's testimony is, indeed, based on his knowledge of and experience with IPFS.   In other words, the question of whether Gallagher's testimony constitutes inadmissible expert testimony is a separate issue from whether his testimony

13

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

constitutes inadmissible hearsay.  A lay opinion on lost profits, like a lay opinion on any other matter, is subject to the hearsay rule.  When Gallagher adopts someone else's opinion as his own—for example, when he adopts the opinions expressed by the authors of the industry publications—he goes beyond the permissible scope of lay opinion testimony.  Such testimony is not based on his knowledge of or experience with IPFS; rather, it is based on another person's work product and another person's opinion.

For these reasons, IPFS cannot use the *Industry Growth Outlook Report* or the *2015 Valuation Handbook* to prove the amount of its future damages.  Without these two publications, IPFS cannot support its future growth rates or its discount rate.  Therefore, there is no evidentiary basis for IPFS' future damages computation, and IPFS' future damages case necessarily fails.

### 2. The evidence clearly demonstrated that IPFS' future damages are remote and speculative.

Even if IPFS' evidence of future damages were admissible, IPFS still did not prove these damages by a preponderance of the evidence.  Under Missouri law, "[p]roof of lost profits is exacting."  Anuhco, Inc. v. Westinghouse Credit Corp., 883 S.W.2d 910, 923 (Mo. Ct. App. 1994).  "Speculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial."  Id. "Recovery for lost profits is not permitted when uncertainty and speculation exist as to whether lost profits would have occurred or whether lost profits emanated from the wrong."  Id. at 923 (citing S. Mo. Bank v. Fogle, 738 S.W.2d 153, 158 (Mo. Ct. App. 1987)).

As explained above, it is pure speculation for IPFS to assume that every dollar of business which the 17 agencies placed with PAC during the term of the Agreement would have been placed with IPFS but for Carrillo's breach of the Agreement.  However, it is an even greater leap of faith for IPFS to assume the 17 agencies would have continued sending a similar volume of business to IPFS for 8

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

14

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

years—a period five times longer than the actual term of the Agreement.  As noted above, there are no contracts between IPFS and the 17 insurance agencies: the agencies would have been free to use any premium finance company at any point during the 8-year future damages period.  Indeed, Michael Gallagher admitted that IPFS' business with these agencies fluctuates from year to year for reasons having nothing to do with the salesperson assigned to each agency. Tr. at 192:6-15  And because the 17 agencies identified with Carrillo, rather than IPFS, it is reasonable to presume they would have explored other premium financing companies even if Carrillo had never solicited them.

Subsequent events have already proven IPFS' assumptions about future damages wrong.  Rachel Yunk admitted that 6 of the 17 agencies—1Source Insurance Group, Michael Ashe Insurance Agency, L/P Insurance Services, McCready Insurance Services, Amnet, and Cutler—still use IPFS for premium financing. Tr. at 346:22-349:9. Since IPFS has an ongoing relationship with each of these 6 agencies, it will presumably win back a portion of the business it allegedly lost to PAC (assuming it tries to).  However, IPFS' static future damage analysis does not allow for the possibility that it will win back business from any of the 17 agencies.

Further, another 3 of the 17 agencies have stopped placing business with PAC since this lawsuit was filed.  Carrillo's uncontroverted testimony established that George Brown Insurance, Omni Insurance Brokerage, and Demart Insurance Solutions have all stopped using PAC and are now using other premium finance companies. Tr. at 63:13-64:5 (Omni); 69:22-70:4 (Demart); 77:9-22 (George Brown). Because these 3 agencies stopped sending business to PAC less than 2 years after Carrillo joined the company, there is no basis for IPFS to assume they would have sent business to IPFS for a full 8 years.

DMWEST #13987282 v8

C.   **IPFS inflated its damages by failing to subtract the full amount of expenses it avoided when Carrillo left the company.**

As detailed above, IPFS is not entitled to any damages. However, even if IPFS were entitled to recover present and/or future damages, it would have to account for all the costs it saved as a result of Carrillo's alleged breach of the Agreement. Under Missouri law, "[t]he goal in awarding damages is to put the non-breaching party in the same position as if the contract would have been performed." Guidry v. Charter Communications, Inc., 269 S.W.3d 520, 532 (Mo. Ct. App. 2008). "The non-breaching party cannot be put in a better position than it would have enjoyed had both parties performed under the contract." Fire Sprinklers, Inc. v. Icon Contr., Inc., 279 S.W.3d 230, 235 (Mo. Ct. App. 2009). Therefore, a plaintiff suing for lost profits may only recover its net lost profits. See Coonis v. Rogers, 429 S.W.2d 709, 714 (Mo. 1968). IPFS' damage computation severely understates the amount of expenses it avoided due to the breach of the Agreement. As a result, the computation inflates the amount of IPFS' damages and places IPFS in a better position that it would have enjoyed if the parties had fully performed under the Agreement.

First, IPFS failed to subtract the full amount of Carrillo's compensation, or "sales expense," when calculating its 2013 profit margin for the 17 agencies. IPFS' computation shows that it paid a total of $133,144 in salary, benefits, reimbursable expenses, and payroll taxes for Carrillo in 2013. Tr. Ex. 9A at 6. Since Carrillo no longer works for IPFS, the company no longer pays these expenses. And since IPFS has not hired a new salesperson to replace Carrillo, Tr. at 245:8-10, it has not reallocated the $133,144 to any other employee. Therefore, IPFS has saved the full amount of $133,144 as a result of Carrillo's departure. However, IPFS only subtracted $37,347 of this amount when calculating its 2013 profit margin. Tr. Ex. 9A at 1. IPFS claims the 17 agencies accounted for approximately 28% of Carrillo's book of business when she worked at IPFS. Tr. at 145:1-146:24. IPFS argues that

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

16

1   only 28% should be subtracted when calculating IPFS' profit margin.  IPFS' opinion

2   as to whether a particular expense is attributable to the 17 specific agencies is

3   irrelevant under Missouri law.  It is a simple matter of fact that IPFS did not hire a

4   replacement for Carrillo, and therefore avoided <u>all</u> of the expenses associated with

5   her employment.  It must subtract the full amount of that expense.

6         Further, to truly account for Carrillo's compensation, IPFS must subtract the

7   full amount Carrillo would have earned during the term of the Agreement (January

8   2014 through July 2015) had she remained with IPFS.  IPFS predicts the amount of

9   compensation Carrillo would have earned during this 18-month period by

10  multiplying the percentage of 1.173% by the amount of receivables PAC received

11  from the 17 agencies during the 18-month period ($2,762,170).  IPFS derived the

12  1.173% figure by dividing Carrillo's compensation in 2013 by the amount of

13  receivables IPFS received from the 17 agencies in 2013.  In other words, IPFS

14  assumes that Carrillo's compensation during the 18-month period from January

15  2014 through July 2015 would have constituted the same percentage of "average

16  receivable" that it constituted in 2013.  This is factually incorrect.  Carrillo's

17  compensation did not depend on the amount of receivables that IPFS received from

18  the 17 agencies.  If Carrillo had continued working for IPFS for the 18-month period

19  from January 2014 through July 2015, she presumably would have been paid 150%

20  of the compensation she earned during the 12 months of 2013.  Therefore, IPFS

21  should have calculated its profit margin by subtracting 150% of Carrillo's total 2013

22  compensation, or $199,716.

23        Second, IPFS failed to subtract the full amount of administrative costs it

24  avoided when the 17 agencies placed business with PAC instead of IPFS.  IPFS

25  incurs an average of $140 in administrative costs for each loan it provides to a

26  customer of an insurance agency.  Tr. Ex. 9A at 4.  In 2013—the year for which

27  IPFS calculated its profit margin—IPFS serviced a total of 900 loans for the 17

28  agencies.  <u>Id.</u>  Therefore, IPFS' total administrative cost associated with these

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

17

agencies was $126,000.   But instead of subtracting the full amount, IPFS only subtracted $26 per loan, resulting in total administrative costs of only $24,300.  <u>Id.</u> at 1. Again, this has the effect of exaggerating IPFS' profit margin.

Third, IPFS also failed to subtract the full "cost of funds" it avoided when the 17 agencies placed business with PAC instead of IPFS.  "Cost of funds" refers to the expense IPFS incurs to obtain money to fund loans.  On average, IPFS' cost of funds for the 17 relevant agencies is 1.450%.  Tr. at 213:14-19 (testimony of Gallagher); Tr. Ex. 9A at 10.   However, IPFS' damage computation uses a smaller figure of 0.559%.  Tr. Ex. 9A at 1.  This does not represent the actual expense IPFS would have incurred to source funds for the agencies' business.  IPFS' actual cost of funds is 1.450%, and that is the amount IPFS must subtract to properly calculate its profit margin.

When these errors are corrected, IPFS' profits are significantly lower:

- If the Court calculates IPFS' profits using the figures in Trial Exhibit 9A, but subtracts the full $199,716 in compensation that Carrillo would have earned from IPFS in January 2014-July 2015, IPFS' lost profits through July 2015 are only $35,393.   This yields future damages of $135,313 through 2023 at IPFS' assumed growth rates, far less than the nearly $800,000 claimed by IPFS in Trial Exhibit 9A. The modified calculation is reproduced at Exhibit C attached hereto.

- The numbers would be reduced even further, and actually turn negative, if IPFS' actual costs for costs of funds and administrative costs are used.[4]

Based on the foregoing, it is obvious that the damages computation proffered by IPFS grossly exaggerates its claimed damages.

---

[4] IPFS' actual cost of funds of 1.45% would reduce the lost profits calculation by approximately $24,000 [1.45% X $2,762,170 = $40,051) minus $15,441].   IPFS' actual administrative costs of $140 per account would reduce the lost profits by another $105,000, approximately [$140/account X 900 accounts = $126,000) minus $21,076].

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

18

**D.     IPFS failed to take reasonable efforts to mitigate its damages, choosing to rely on litigation instead.**

"[O]ne damaged through alleged breach by another of some legal duty or obligation [has to] make reasonable efforts to minimize the resulting damage." Cunningham v. Cunningham, 805 S.W.2d 363, 365 (Mo. App. 1991).  After Carrillo left the company, IPFS should have taken at least three commonsense steps to mitigate its damages.  First, IPFS should have hired a full-time replacement for Carrillo in Southern Nevada.  Instead, IPFS reassigned Carrillo's book of business to a part-time salesperson named Rusty Smeds who lives in Southern California and only works in Las Vegas for one week out of each month.  Tr. at 246:14-16 & 372:2-4.  This obviously hampered IPFS' ability to preserve business with the 17 agencies, which are all located in Nevada.  Tr. at 275:25-276:10 (Kugelmann's testimony regarding importance of local sales force).  Second, IPFS could have required Carrillo to continue working for IPFS for an additional two weeks after she gave notice she was leaving.  This would have given IPFS additional time to solidify its relationships with the 17 agencies and transition the agencies to new salespeople.  But even though Carrillo provided two weeks' notice, IPFS declined to have her work this additional time.  Tr. at 103:17-24 (Carrillo).  Third, and relatedly, IPFS should have visited each of 17 of the agencies as soon as possible after Carrillo announced her resignation.  However, Rachel Yunk—the witness whom IPFS called on the issue of mitigation—testified that she only visited 4 of the agencies.  Tr. at 361:1-4.  Since Carrillo has established the defense of failure to mitigate, IPFS is not entitled to recover any damages.

**E.     IPFS cannot recover damages which accrued before the Court modified the Agreement.**

IPFS cannot recover any damages it allegedly incurred before July 8, 2015, the date the Court modified the Agreement to make it enforceable under Missouri law.  To establish a breach of contract, the party claiming breach must show: (1) the

19

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

existence of an enforceable contract; (2) the presence of mutual obligations under the contract; (3) the failure to perform an obligation specified in the contract; and (4) damages. <u>Sch. Dist. of Kan. City v. Bd. of Fund Comm'rs</u>, 384 S.W.3d 238, 259 (Mo. Ct. App. 2012). In this case, the Agreement was clearly unenforceable as written. Therefore, as written, the Agreement did not satisfy the first element of breach of contract and did not support an award of damages. There was no enforceable contract between the parties until July 8, 2015, when the Court modified the Agreement to make it enforceable under Missouri law. Therefore, as a matter of simple contract law, IPFS cannot recover damages which accrued before July 8, 2015. Because IPFS seeks damages for the period from January 2014 through July 2015, almost all of its claimed damages are not recoverable.

Further, the modified version of the Agreement does not "relate back" to the beginning of the non-compete period in January 2014 or to the signing of the Agreement in 1993. This argument would be plausible if, for example, the Court had removed a portion of the restrictive covenant, leaving the remainder of the covenant to be enforced against Carrillo retroactively. But that is not what happened here; instead, the Court completely removed and rewrote the covenant. As originally written, Section 3 of the Agreement was a non-competition covenant that "effectively prevent[ed] Defendant from working for any premium financing company anywhere in the world to whom Plaintiff has sent as much as a letter." Doc. 85 at 6. The Court responded by removing Section 3 and replacing it with a completely different provision that prohibited Carrillo from soliciting various clients of IPFS, rather than working for competitors of IPFS. Since this new covenant was not included in the original Agreement in any form, it cannot govern conduct that occurred before the Court added it to the Agreement on July 8, 2015. Carrillo could not conform her conduct to a modified version of the Agreement that did not yet exist. Therefore, the Court should not award damages that allegedly accrued before July 8, 2015.

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

20

IV.   **CONCLUSION**

Under Missouri contract law, the Federal Rules of Evidence, and the limitations of arithmetic, IPFS cannot recover the amount of damages it is seeking from Carrillo.   Missouri law prohibits the Court from placing IPFS in a better position that it would have enjoyed if Carrillo had complied with the Agreement. However, that is precisely what IPFS now seeks by asking the Court for damages well in excess of its actual lost profits.   Perhaps worst of all, IPFS seeks to hold Carrillo liable for breaching a modified version of the Agreement that did not even exist until July 2015—shortly before the Agreement expired.   The Court should end IPFS' quixotic bid to recover a million-dollar judgment from a mid-level salesperson, and should hold that IPFS failed to meet its burden of proving damages.

Dated: March 30, 2016.

BALLARD SPAHR LLP

By: /s/ Matthew D. Lamb
    Matthew D. Lamb
    Nevada Bar No. 12991
    100 North City Parkway, Suite 1750
    Las Vegas, Nevada 89106

    *Attorneys for Defendant*

DMWEST #13987282 v8

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

## CERTIFICATE OF SERVICE

I certify that on March 30, 2016 a true and correct copy of **Defendant's Closing Argument** was filed via the Court's CM/ECF System and electronically served by the Court on all parties who have appeared in the action.

/s/ Sarah Walton
An Employee of Ballard Spahr LLP

Ballard Spahr LLP
100 North City Parkway, Suite 1750
Las Vegas, Nevada 89106-4617

DMWEST #13987282 v8