UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| IPFS CORPORATION, a Missouri Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| LORRAINE CARRILLO, an individual, | ) ) |
| Defendant. | ) ) ) |

Case No.: 2:14-cv-00509-GMN-NJK

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# I. INTRODUCTION

Liability for Defendant Lorraine Carrillo's breach of her non-solicitation agreement was already established by the Court's summary judgment ruling (ECF No. 85). During the two-day bench trial (February 8-9, 2016), the Court heard evidence from four witnesses, including Carrillo, that proved with reasonable certainty that Carrillo's breach caused IPFS to suffer lost profits. For each of the 17 customers identified on IPFS's damage calculation, Carrillo admitted that she (1) previously managed those customer relationships on behalf of IPFS; (2) solicited them soon after she left IPFS; and (3) successfully facilitated loans for these customers for IPFS's competitor, Premium Assignment Corporation ("PAC").

IPFS's witnesses testified that despite IPFS's vigorous efforts to maintain its customer relationships following Carrillo's departure, IPFS's sales to these customers dropped by 85 percent. Trial witnesses described the critical nature of personal relationships for sales in the premium finance industry. Carrillo agreed that personal relationships are key in this business.

Ms. Rachel Yunk testified about her in-person meetings with many of these customers shortly after Carrillo went to work for PAC. These customers were satisfied with IPFS and polite to Ms. Yunk, yet nonetheless expressed their continued loyalty and desire to send their business to Carrillo.

PAC's president, Peter Kugelmann, admitted that PAC increased its sales to these 17 customers due to Ms. Carrillo's efforts and because Carrillo was now teamed with PAC. He admitted that PAC had very little or no prior business with nearly all of these customers prior to Carrillo's involvement. Mr. Kugelmann testified that PAC compensated Carrillo for soliciting these customers and reimbursed Carrillo's expenses for entertaining them. He also verified the amount of increased business PAC reaped from these customers.

IPFS's president, Michael Gallagher, testified about his application of IPFS's profitability analysis to the business Carrillo carried with her to PAC. Based on the total amount of loans financed and various overhead expenses, Mr. Gallagher's analysis identified the amount of profit IPFS would have realized from these customers during the timeframe of Carrillo's employment restriction. Mr. Gallagher also explained how IPFS values its customer relationships by projecting profits for a minimum of 8 years and applying a discount rate to account for both risk and growth. Many of the subject customers had been with IPFS for nearly two decades and IPFS had a long history of profitability on these relationships. Mr. Gallagher, applying the method approved by Missouri law and using the best evidence available, testified that IPFS suffered lost profits in the amount of $978,000.

II.     **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.      IPFS is a premium finance company that provides specialized lending for businesses and individuals to pay for insurance coverage. (Gallagher, pp. 110:21–111:7).

2.      Insurance agents engage IPFS to offer financing to their policy holders. *Id.*

3. The relationship between the insurance agents and sales representatives is critical to success in this industry. (Carrillo, pp. 93:1–7; 106:15–107:15; Kugelmann, pp. 293:22–294:2; Yunk, pp. 320:17–321:4).

4. During Carrillo's 21-year tenure at IPFS, Carrillo was responsible for marketing IPFS's premium financing products and services to insurance agents in Nevada, and parts of Arizona and Utah. (Carrillo, pp. 83:7–25; 96:6–21).

5. In order to protect IPFS's business interests, in June of 1993, IPFS and Carrillo entered into an Employment Agreement ("Agreement"). (Carrillo, p. 21:2–5).

6. The Agreement expressly states that Carrillo:

> shall not, during the period of Employee's employment with Employer and for a period of eighteen (18) months thereafter, directly or indirectly, in any manner or capacity, engage in or have a financial interest in any business carried on by the Employer during the period of Employee's employment, if such business at any time contacts or solicits or attempts to contact or solicit any Customer or Potential Customer with whom Employer is doing business at the time of termination of Employee's employment.

(Ex. A to Complaint, ECF No. 1-1).

**A.     IPFS Proved the Fact of Damages with Reasonable Certainty**

7. On January 23, 2014, Carrillo terminated her employment with IPFS to begin employment with PAC two weeks later. (Carrillo, p. 21:6–17).

8. Carrillo admits that PAC is a direct competitor of IPFS, that her job responsibilities at PAC are the same as the ones she held at IPFS, and that she is seeking business in the same Las Vegas territory she served on behalf of IPFS. (Carrillo, pp. 21:10–22:11; 23:10–12).

9. Carrillo immediately set about soliciting IPFS's customers. (Carrillo, pp. 31:22–33:8).

10. For example, on February 10, 2014, Carrillo e-mailed her superior at PAC to identify the customers she intended to solicit that week. (Carrillo, pp. 31:22–33:8; Plaintiff's Trial Ex. 22-10).

11. Carrillo identified 17 customers for solicitation, 15 of whom were current IPFS customers. (Carrillo, pp. 31:22–33:8; Pl.'s Trial Ex. 22-10; Ex. C to Yunk Aff., ECF No. 1-2).

12. IPFS learned that Carrillo was targeting its customer base when several customers accidentally e-mailed Carrillo's IPFS e-mail account in response to the solicitations she made on behalf of PAC. (Yunk, pp. 338:10–339:13).

13. IPFS initiated this action on April 3, 2014 and asserted claims for injunctive relief and damages. (*See* Compl., ECF No. 1).

14. Although the Agreement prohibits Carrillo from employment with any competitor, IPFS's Complaint sought to enforce the Agreement more narrowly to merely prohibit Carrillo from soliciting Las Vegas customers with whom she dealt while at IPFS. (*Id.* 6:1–6).

15. IPFS identified these 103[1] customers on a proposed "Restricted List" and attached it to the Verified Complaint. (Ex. C to Yunk Aff., ECF No. 1-2).

16. On October 27, 2015, IPFS moved for partial summary judgment on the issue of liability and requested injunctive relief. (*See* ECF No. 44).

17. The Court granted IPFS's motion in its entirety, granting the injunction and finding that the "record evidence conclusively establishes Defendant's breach of the Agreement as modified by the Court." (Order 9:18–19, ECF No. 85).

---

[1] IPFS did not oppose omitting from the Restricted List the 5 customers Carrillo claimed she never solicited. The final number of customers on the Restricted List was 98.

18. However, by the time the Court entered its injunction, Carrillo had been actively soliciting IPFS's customers for nearly eighteen months, thereby causing damage to IPFS's customer relationships. (*See* Pl.'s Trial Ex. 9-A).

19. With liability already established by the partial summary judgment order, the Court conducted a bench trial on February 8-9, 2016 to determine the amount of damages IPFS can recover from Carrillo's established breach of contract. (*See* ECF Nos. 85, 124–25).

20. At trial, IPFS presented a damage calculation based on Carrillo's improper solicitation of 17 specific customers from which Carrillo successfully transferred business to PAC. (Carrillo, pp. 24:6–25:3; Gallagher, pp. 115:18–116:17; Pl.'s Trial Ex. 9-A).

21. Carrillo admitted soliciting each of the 17 customers, both on behalf of IPFS, and now on behalf of PAC.

    a. George Brown Insurance: (Carrillo, pp. 76:2–77:8).

    b. 1Source Insurance: (Carrillo, pp. 56:21–57:25).

    c. Wood and Associates:  (Carrillo, pp. 61:20–62:15).

    d. Michael Ashe Insurance: (Carrillo, p. 59:8–24).

    e. American Insurance of Nevada: (Carrillo, pp. 46:11–47:20; 48:9–16).

    f. Omni Insurance Brokerage: (Carrillo, p. 63:4–16).

    g. L/P Insurance Las Vegas:  (Carrillo, pp. 25:1–29:19).

    h. McCready Insurance:  (Carrillo, pp. 67:17–68:14)

    i. Demart Insurance Solutions:  (Carrillo, pp. 69:13–70:4).

    j. Branch-Hernandez & Associates: (Carrillo, pp. 70:5–71:3).

    k. Aniello Insurance:  (Carrillo, pp. 50:1–52:5).

    l. Landini & Associates: (Carrillo, pp. 39:4–40:12).

    m. Western Sage: (Carrillo, pp. 71:13–72:10).

    n. Amnet, Inc.:  (Carrillo, pp. 72:14–74:18).

      o.  Royle Insurance: (Carrillo, pp. 54:15–55:25).

      p.  Insurance Solutions: (Carrillo, pp. 42:21–45:10).

      q.  Cutler, LLC: (Carrillo, pp. 75:6–76:1).

22.    Carrillo described how she used PAC's expense account to entertain and build customer relationships with many of these same customers. (Carrillo, pp. 41:11–42:6; 42:21–45:10; 48:25–49:14; 54:15–55:25; 61:5–19; 80:6–25; Pl.'s Trial Ex. 22-5).

23.    Carrillo admitted to successfully facilitating loans for PAC with each of the 17 customers identified on IPFS's damage calculation. (Pl.'s Trial Ex. 5)

      a.  George Brown Insurance: (Carrillo, p. 77:5–8).

      b.  1Source Insurance: (Carrillo, pp. 57:22–58:14).

      c.  Wood and Associates: (Carrillo, p. 62:11–15)

      d.  Michael Ashe Insurance: (Carrillo, pp. 59:21–61:7).

      e.  American Insurance of Nevada: (Carrillo, pp. 47:21–48:16).

      f.  Omni Insurance Brokerage: (Carrillo, p. 63:4–16).

      g.  L/P Insurance Las Vegas: (Carrillo, p. 29:9–19).

      h.  McCready Insurance: (Carrillo, p. 68:8–14).

      i.  Demart Insurance Solutions: (Carrillo, p. 70:1–4).

      j.  Branch-Hernandez & Associates: (Carrillo, pp. 70:22–71:3).

      k.  Aniello Insurance: (Carrillo, p. 52:3–5).

      l.  Landini & Associates: (Carrillo, pp. 39:24–40:12).

      m.  Western Sage: (Carrillo, p. 72:4–10).

      n.  Amnet, Inc.: (Carrillo, pp. 73:24–74:18).

      o.  Royle Insurance: (Carrillo, pp. 54:15–55:25).

      p.  Insurance Solutions: (Carrillo, pp. 42:21–45:10).

      q.  Cutler, LLC: (Carrillo, pp. 75:6–76:1).

24. Carrillo identified PAC's business records that demonstrated her sales to these 17 customers and did not dispute their accuracy. (*See, e.g.*, Carrillo, pp. 27:23–29:7; 43:15–19; 48:12–16; 55:5–7; 78:21–79:5).

25. Carrillo admitted that all of these customers had been IPFS customers for several years, and in some cases, more than twenty.

    a. George Brown Insurance: (Carrillo, pp. 76:20–77:4).

    b. 1Source Insurance: (Carrillo, p. 58:7–14).

    c. Wood and Associates: (Carrillo, p. 62:8–10).

    d. Michael Ashe Insurance: (Carrillo, p. 59:17–20).

    e. American Insurance of Nevada: (Carrillo, p. 47:13–18).

    f. Omni Insurance Brokerage: (Carrillo, p. 63:10–12).

    g. L/P Insurance Las Vegas: (Carrillo, pp. 25:21–26:4).

    h. McCready Insurance: (Carrillo, p. 67:23–25).

    i. Demart Insurance Solutions: (Carrillo, p. 69:19–21).

    j. Branch-Hernandez & Associates: (Carrillo, p. 70:14–16).

    k. Aniello Insurance: (Carrillo, p. 51:11–14).

    l. Landini & Associates: (Carrillo, p. 39:21–23).

    m. Western Sage: (Carrillo, p. 72:1–3).

    n. Amnet, Inc.: (Carrillo, p. 73:13–23).

    o. Royle Insurance: (Carrillo, pp. 54:15–55:25).

    p. Insurance Solutions: (Carrillo, pp. 42:21–45:10).

    q. Cutler, LLC: (Carrillo, pp. 75:6–76:1).

26. PAC's president, Peter Kugelmann, testified at trial and admitted that PAC had very little or no prior business with most of these customers prior to Carrillo's involvement. (Kugelmann, pp. 294:9–295:1; Pl.'s Trial Ex. 6).

27. Indeed, Mr. Kugelmann never indicated that PAC had any substantial prior business with *any* of the 17. (Kugelmann, pp. 267:11–314:25).

28. Mr. Kugelmann testified that PAC compensated Carrillo for soliciting these customers and reimbursed Carrillo's expenses for entertaining them. (Kugelmann, pp. 291:16–294:2).

29. Mr. Kugelmann admitted that PAC's increased sales to these customers were the results of Carrillo's efforts. (*See, e.g.*, Kugelmann, pp. 296:3–6; 299:9–20; 301:4–10; 305:18–21; 311:2–6).

30. One of IPFS's vice-presidents, Rachel Yunk, testified to IPFS's concerted effort to transition the relationships with these 17 customers to a new IPFS sales executive, who was an industry veteran with a successful track record for taking over new territories. (Yunk, pp. 324:16–325:6; 337:1–338:9).

31. IPFS's customer retention efforts included prompt letters, e-mails, numerous phone calls, in-person meetings, and attempted follow-up meetings. (Yunk, pp. 323:23–335:23).

32. In the past, when IPFS has not had to compete against a former employee breaching a non-solicitation agreement, IPFS has successfully transitioned customer relationships and maintained or grown the business. (Yunk pp. 336:23–338:9).

33. Ms. Yunk testified that despite IPFS's efforts to save these 17 customer relationships, its sales to these customers dropped by 85%. (Yunk, pp. 323:23–328:4; 343:11–15).

34. Ms. Yunk described her in-person meetings with many of these customers shortly after Carrillo went to work for PAC. (Yunk, pp. 327:12–328:4).

35. These customers were satisfied with IPFS and polite to Ms. Yunk, yet nonetheless expressed their continued loyalty and desire to send their business to Carrillo. (*See* Yunk, pp. 328:11–19; 330:7–14).

36. "In an action for breach of contract, a plaintiff may recover the benefit of his or her bargain as well as damages naturally and proximately caused by the breach and damages that could have been reasonably contemplated by the defendant at the time of the agreement." *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 533 (Mo. Ct. App. 2008) (quoting *Birdsong v. Bydalek*, 953 S.W.2d 103, 116 (Mo. Ct. App. 1997)).

37. "[O]ne damaged through alleged breach by another of some legal duty or obligation [has to] make reasonable efforts to minimize the resulting damage." *Cunningham v. Cunningham*, 805 S.W.2d 363, 365 (Mo. Ct. App. 1991).

38. Based on the foregoing evidence and the totality of the circumstances, including IPFS's intensive efforts to retain the business and its past success with transitioning customer relationships, the Court finds that IPFS demonstrated with reasonable certainty that Carrillo's breach of contract caused IPFS to suffer lost profits, and that IPFS made all reasonable efforts to mitigate its damages.

**B.    IPFS Used the Best Evidence Available to Demonstrate that $978,000 is a Rational Estimate of the Damages**

39. To find the appropriate amount of damages to award IPFS, the Court looks to Missouri law because the Court has already determined to apply the Missouri choice of law provision in Carrillo's Employment Agreement. (Order 4:20–23, ECF No. 37).

40. Under Missouri law, a proper measure of damages in a breach of a non-solicitation agreement is the recovery of lost profits. *See, e.g.*, *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 305 (Mo. Ct. App. 1980).

41.     The term "loss of profits" refers to the amount of net profits the plaintiff would have realized had its clients not been lost as a result of the defendant's actions. *Ameristar Jet Charter, Inc. v. Dodson International Parts, Inc*., 155 S.W.3d 50, 54 (Mo. 2005) (en banc).

42.     Although an estimate of anticipated profits must rest on more than mere speculation, uncertainty as to the amount of profits that otherwise would have been made does not prevent recovery. *Id*. at 54–55.

43.     "[O]nce the plaintiff has established the *fact* of lost profits, to establish the *amount* of lost profit with reasonable certainty, 'all that is required by Missouri courts' is that it be supported by the best evidence available." *BMK Corp. v. Clayton Corp*., 226 S.W.3d 179, 196 (Mo. Ct. App. 2007) (quoting *Refrigeration Industries, Inc. v. Nemmers*, 880 S.W.2d 912, 920 (Mo. Ct. App. 1994)); *see also Smith Moore & Co. v. J.L. Mason Realty & Inv., Inc.,* 817 S.W.2d 530, 534 (Mo. Ct. App. 1991) (reasoning that "the requirement that damages be shown with certainty is on the fact of damages and not on the particular amount.")

44.     A plaintiff produces the best evidence available when he or she produces "all relevant facts tending to show the extent of damages and one is not excused for a breach of contract resulting in damages simply because those damages may not be established with certainty." *Smith Moore*, 817 S.W.2d at 534.

45.     To recover lost profit damages caused to an established business, like IPFS, the plaintiff must demonstrate "proof [of] the income and expenses of the business for a reasonable anterior period, with a consequent establishing of the net profits during the previous period." *See Midwest Coal, LLC ex rel. Stanton v. Cabanas*, 378 S.W.3d 367, 370 (Mo. Ct. App. 2012).

46.     Finally, once the plaintiff has put forth the best evidence available, the amount of damages is a question for the fact finder. *BMK*, 226 S.W.3d at 196.

47.     IPFS's president, Michael Gallagher, testified that IPFS sought damages based on IPFS's profitability analysis of the loans Carrillo diverted to PAC, taking into account the

expenses necessary to create that revenue stream and the costs not incurred because of the loss of the revenue. (Gallagher, p. 113:10–15; *see also* Pl.'s Trial Ex. 9-A).

48. Carrillo's counsel objected to the admission of Plaintiff's Trial Ex. 9-A, IPFS's damages computation, because it had been modified since the time of its initial service. (Trial Tr. pp. 113:16–115:4).

49. Carrillo's pre-trial brief pointed out that IPFS's damage computation did not account for amounts IPFS would have paid for Carrillo's health insurance, 401(k) match, and payroll taxes. (Def.'s Trial Br. 13:27–14:2, ECF No. 115).

50. Additionally, Carrillo contended that one customer included in the computation had gone out of business, and another customer in the computation had actually left IPFS prior to Carrillo's departure. (Gallagher, p. 183:2–10).

51. Accordingly, IPFS amended its damage computation to account for the missing expenses and remove two customers, leaving a total of 17. (Gallagher, pp. 112:11–20; 183:2–10).

52. IPFS provided a copy of Plaintiff's Trial Ex. 9-A to Carrillo in advance of trial. (Trial Tr., pp. 9:15–11:5).

53. The Court admitted Plaintiff's Ex. 9-A into evidence because Carrillo was not prejudiced, as nothing in the methodology changed and the overall amount of potential liability decreased. (Trial Tr., p. 248:7–17).

54. Carrillo's counsel also objected to the admission of Plaintiff's Trial Ex. 9-A and Mr. Gallagher's testimony about the exhibit because it was prepared with the help of IPFS's outside accountant. (Trial Tr. pp. 113:16–115:4).

55. Mr. Gallagher explained that IPFS's damage spreadsheet was prepared by Stephen Browne, an independent CPA, with the help of IPFS's "finance people." (Gallagher, p. 175:16–22).

56. However, Mr. Gallagher also testified that he personally confirmed all of the calculations and reviewed the supporting documentation, which was IPFS's raw financial data and several industry publications that Mr. Gallagher uses for other, non-litigation purposes. (*See, e.g.*, Gallagher, pp. 123:13–21; 125:9–23; 127:10–19).

57. At trial, Mr. Gallagher demonstrated a thorough understanding of both IPFS's financial records and the methodology used in IPFS's damages computation.  (*Id.*).

58. The Court properly admitted both Plaintiff's Trial Ex. 9-A and Mr. Gallagher's testimony because a "business owner's testimonial evidence is sufficient to provide the trier of fact with a rational basis for estimating damages to the plaintiff, including lost profits." *BMK Corp.*, 226 S.W.3d at 196.

59. Mr. Gallagher's testimony is permitted by Federal Rule of Evidence 701, which does not require expert testimony to present evidence of projected profits because business officers and "owners may present lay testimony regarding their company's profits, value, and damages." *See Impact Mktg. Int'l, LLC v. Big O Tires, LLC*, No. 2:10:CV-01809-MMD, 2012 WL 2092815, at *4 (D. Nev. June 11, 2012).

60. Mr. Gallagher testified that IPFS used PAC's business records to identify the amount of sales Carrillo made in violation of her agreement during the term of her restriction. (Gallagher, p. 119:17–23).

61. Mr. Gallagher identified IPFS's profitability by analyzing IPFS's historic records of the amount financed for these 17 customers, average receivable, interest income, less cost of funds, less administrative cost, less agent fees, less charge offs, plus late charges, pre-tax profit before expenses, less sales expenses, to arrive at the amount of lost profit. (*See* Gallagher, p. 115:18–25; Pl.'s Trial Ex. 9-A).

62. Mr. Gallagher thoroughly described these industry-specific factors to explain how IPFS derives its revenue and identifies profit. (Gallagher, pp. 122:21–130:22).

63. The profitability analysis included deductions for Carrillo's compensation, sales expenses, health insurance, retirement contributions, and payroll taxes, which IPFS saved as a result of Carrillo's termination. (Gallagher, pp. 145:22–146:4).

64. The profitability analysis also included IPFS's relationship history with the 17 clients, noting that 2 agents had been IPFS customers for 3-5 years, 2 agents had been IPFS customers for 5-10 years, 3 agents had been customers for 10-15 years, and 10 agents had been IPFS customers for more than 15 years. (*See* Pl.'s Trial Ex. 9-A).

65. Mr. Gallagher testified how IPFS applied this profitability analysis to the amount financed by PAC to these same 17 customers, based on PAC's sales from February 2014 to July 2015 (the timeframe of Carrillo's employment restriction), and PAC's annualized sales for 2015. (Gallagher, pp. 119:17–121:20).

66. IPFS used the annualized 2015 lost profits to make its projections because this timeframe more accurately reflects IPFS's lost business, as it takes time for transferred business to "ramp up." (Gallagher, pp. 147:7–148:4).

67. IPFS projected its lost profits for the next 8 years and applied a 17% discount rate to arrive at a $978,000 damage figure. (*See* Pl.'s Trial Ex. 9-A).

68. Mr. Gallagher explained, in detail, how IPFS selected and applied a discount rate to its projections, which is a "risk factor discounting the projected income down to a risk adjusted level." (Gallagher, p. 160:1–4).

69. Mr. Gallagher described IPFS's "Discount Rate Build-up Method," as a calculation that IPFS used in past acquisitions. (Gallagher, pp. 161:9–162:24).

70. IPFS's discount rate adjusts the projections to account for numerous risk factors, including the possibility that the customer may go elsewhere for financing, go out of business, or be acquired by another entity. (Gallagher, pp. 162:21–163:9).

71. IPFS's discount rate also factors in variable growth rates, which are comprised of a weighted average of the 5-year treasury bill rate, the S&P 500 return rate, an industry-specific growth rate, and a final adjustment to account for risk associated with a particular book of business. (Gallagher, pp. 159:13–162:20).

72. Mr. Gallagher explained that he relied on several business and industry publications, including ones issued by Duff & Phelps and Colonnade, to identify the applicable rates; he testified that he used these publications for non-litigation purposes and, in fact, one of these publications included information specifically about IPFS's prior acquisitions. (Gallagher, pp. 148:18–149:22; 161:14–162:16).

73. Additionally, Mr. Gallagher explained that when IPFS conducts mergers and acquisitions, IPFS values existing books of business by projecting profits for a minimum of 8 years and discounting between 15 and 20%. (Gallagher, pp. 160:1–25; 241:4–10).

74. Mr. Gallagher testified that the industry as a whole (as well as these 17 customers considered as a whole) experienced growth as indicated in IPFS's projections. (Gallagher, pp. 253:25–255:12).

75. To the extent certain customers may experience a downturn in business, as highlighted by Carrillo, IPFS's damage computation addresses this possibility in its 17% discount factor. (Gallagher, pp. 162:17–163:9).

76. Finally, although growth rates are included in the discount rate, the discount rate has the overall effect of lowering the projected damages. (Gallagher, p. 160:18–21).

77. The Court finds that IPFS presented the best evidence available to demonstrate that $978,000 is a rational estimate of the lost profits caused by Carrillo's breach of contract, and accordingly, enters final judgment in favor of IPFS for the amount of $978,000.

III. **<u>CONCLUSION</u>**

1   **IT IS HEREBY ORDERED** that judgment is entered in favor of IPFS for the amount
2   of $978,000.
3   The Clerk of the Court shall enter judgment accordingly.
4   **DATED** this __16__ day of May, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Judge